**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 2:18-cr-00008-APG-NJK |
| Plaintiff, ) | |
| ) | REPORT AND RECOMMENDATION |
| vs. ) | |
| ) | (Docket No. 27) |
| ROOSEVELT JONES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter was referred to the undersigned Magistrate Judge on defendant Roosevelt Jones' motion to suppress evidence statements. Docket No. 27. The Court has considered Defendant's motion and exhibits, the United States' response and exhibits, the United States' supplement, defendant's reply,[1] and both parties' oral argument. Docket Nos. 27, 28, 29, 30, 31, 33, 36.

**I.    BACKGROUND**

On August 12, 2017, at 9:29 p.m., a call was made to 911. Exhibit A at 0:09.[2] The caller initially stated, "There is a man with a gun over here." *Id*. at 0:23. When the 911 operator asked

---

[1]    Defendant filed both a reply and a corrected image of that reply. Docket Nos. 32, 33. The Court considered the corrected image as Defendant's reply. Docket No. 33.

[2]    Both parties relied upon the police reports, police body camera footage, and audio recordings of the 911 calls for their recitation of facts. *See, e.g.*, Docket No. 27 at 2, n. 1; Docket

where, the caller responded with the address and apartment number. *Id*. at 0:27 - 0:29. The caller was also able to give the cross streets and tell the operator that the location was "caddy-corner" from Bonanza High school. *Id*. at 0:44 – 0:59. When the operator asked the caller what the man was doing with the gun, the caller responded, "I don't care what he's doing, he's got it in his pants." *Id*. at 1:04 – 1:10. When the operator stated she needed to know what the man with the gun was doing with it, the caller stated that the man was "threatening to kill somebody." *Id*. at 1:10 – 1:20. The operator asked if the gun was in the man's waistband, and the caller said, "Give it a minute, it will be pulled out." *Id*. at 1:21 – 1:30.

The operator asked the caller for a physical description of the man with the gun, and the caller expressed concern that talking would "get me beat up." *Id*. at 1:31 – 1:45. The caller then stated that the man with the gun is a black man with a white plaid shirt. *Id*. at 1:46 – 1:52, 2:40 – 2:41. The caller further stated that the man looks about 32-33 years old, and is about 5'10" and 180 pounds. *Id*. at 1:54 – 2:07. As the operator asked for more information about the man with the gun, the caller again expressed concern for his safety: "You're trying to get me in trouble." *Id*. at 2:08 – 2:27. The caller stated that the man is driving a blue "ex-police car," which he clarified after prompting from the operator was a Crown Victoria. *Id*. at 2:45 – 3:03.

The caller stated that the man was outside apartment 61 "having fun," but that the man showed the gun twice, "and he said he was going to fix somebody." *Id*. at 3:04 – 3:23. The caller said he told the man he hoped it wasn't him, and the man said, "No, not you, OG." *Id*. at 3:23 – 3:27. The caller identified himself as "the guy under the blue umbrella." *Id*. at 3:28 – 3:35. The caller also told the operator that the man "smoked some weed and drank a beer." *Id*. at 3:35 –

---

No. 29 at 2. The Court therefore derives its factual background from the same documents and recordings.

3:45. The caller then clarified that he did not see the man smoke weed. *Id*. at 3:45 – 4:00. The caller told the operator the name of the apartment complex, as well as the specific building where the man was currently located, and repeated that the man had a weapon. *Id*. at 4:01 – 4:43. The caller said he called because his son told him he had to do so, and he felt he had to call because the man told him he was "going to take somebody out," and wouldn't tell him who it was. *Id*. at 5:15 – 5:36.[3] The caller said that he lives in apartment 63, and that he was calling from that apartment. *Id*. at 7:16 – 7:21.

On August 12, 2017, Las Vegas Metropolitan Police Department ("LVMPD") Officers Amundson and Lehmann were dispatched, in response to a 911 call regarding a black adult male with a handgun in his waistband, to an apartment complex located at 1200 Redwood in Las Vegas. Docket No. 27-4 at 4-5. The details given to the officers, as written in their report, were that the male was "standing by building D wearing blue jeans and a white and blue plaid shirt and was threatening subjects in the complex that he was going to kill someone. *Id*. Officer Amundson's bodycam video provides a description of the man, as it is given to them over the radio from dispatch: "A BMA in a blue older Crown Victoria, in his thirties, 5'10", heavy build, white plaid shirt." Exhibit B (Officer Amundson's bodycam footage) at 0:45 – 0:55. The officers are given the name of the complex as Redwood Gardens with an address of 1200 Redwood Street. *Id*. at 0:57 – 1:44.

After Officers Amundson and Lehmann arrived at the location, they were given an update that the man for whom they were looking would be under a blue umbrella, that he had been

---

[3] The caller also spoke of how well his son is doing in school and, at one point, joked that, if reward money was available, "I do need tuition money for my son…" *Id*. at 5:50 – 6:02.

3

drinking, and that "all the parties" were near the laundry room. *Id*. at 3:00 – 3:11. In response to an officer's question, dispatch stated that the subject was near Building D. *Id*. at 3:12 – 3:16.

      The officers walked to the location near building D, where a group of people was gathered. *Id*. at 3:56 – 4:07. It was dark outside, and an officer shone a flashlight on the group. *Id*. at 4:11 – 4:15. Defendant Roosevelt Jones, who matched the description the officers had been given, was in the group. Docket No. 27-4 at 4-5. Defendant, who was wearing a white plaid shirt and holding a beer bottle, turned and started walking up the stairs that were next to him as the officers approached. Exhibit B at 4:13 – 4:18. Officer Lehmann followed Defendant, stating, "Let me talk to you, let me talk to you." *Id*. Defendant raised his arms, causing his shirt to rise above his waistband, and the officers could see a silver semi-automatic handgun "on his right hip tucked into his pants." Docket No. 27-4 at 4-5. As Officer Lehmann walked part of the way up the stairs, Officer Amundson told Defendant to come down the stairs. Exhibit B at 4:18 – 4:23. Defendant said he was "just drinking a beer." *Id*. at 4:22 – 4:24. Officer Amundson told Officer Lehmann to watch Defendant's hands, and Officer Lehmann stated that Defendant has a gun. *Id*. at 4:24 – 4:28. After Defendant came down the stairs, officers handcuffed him. *Id*. at 4:28 – 5:06. The officers then walked Defendant to their squad car. *Id*. at 5:06 – 6:00.

      When officers recovered the firearm, they discovered that it was a silver Ruger 22/45 with an obliterated serial number. Docket No. 27-4 at 4-5. A record check found that Defendant has prior felony convictions, including one for attempt possession of a firearm by prohibited person. *Id*. Officers arrested Defendant and impounded the firearm. *Id*.

      On January 9, 2018, a federal grand jury sitting in Las Vegas, Nevada issued an indictment charging Defendant with one count of felon in possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2). Docket No. 1. Defendant now asks the

Court to suppress the firearm found on his person on August 12, 2017, as well as any post-arrest statements he made in response to police questioning on the scene. Docket No. 27.

## II. ANALYSIS

### A. Evidentiary Hearing

The United States Court of Appeals for the Ninth Circuit has held that an evidentiary hearing on a motion to suppress need only be held if the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the court to conclude that contested issues of material fact exist. *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (*citing United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986); *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990); *United States v. Irwin*, 613 F.2d 1182, 1187 (9th Cir. 1980); *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972).

"A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant disputed factual issue' exists such that a hearing is required." *Howell*, 231 F.3d at 621 (*citing Harris*, 914 F.2d at 933). The determination of whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court. *United States v. Santora*, 600 F.2d 1317, 1320 (9th Cir.), *amended by* 609 F.2d 433 (1979). In the instant case, Defendant requested an evidentiary hearing in his original motion, but stated in his reply that he only requested oral argument. Further, both parties relied upon the same reports and body camera footage generated by LVMPD, and the same 911 call, in presenting the facts. The Court concludes that no contested issues of fact exist that require an evidentiary hearing in this matter, and the Court will therefore decide the motion on the moving and responsive papers, including the exhibits submitted with the papers.

. . . .

5

### B. Motion to Suppress

Defendant asks the Court to suppress the gun recovered from his person, as well as all post-arrest statements. *See* Docket No. 27. In support of his request, Defendant submits that the 911 call did not establish reasonable suspicion to stop him because the caller did not report any crime. *Id*. at 6. Defendant submits that, despite the fact that the caller stated the man with the gun had taken it out of his waistband twice and said he was going to "fix" somebody, the man was "just having fun." *Id*. Further, Defendant submits that, when officers arrived on the scene, they observed nothing that gave them reasonable suspicion to stop him. *Id*. at 6-7.

Defendant additionally submits that the 911 call itself lacked sufficient indicia of reliability. *Id*. at 7-8. Defendant submits that the caller was "audibly intoxicated" and admitted that he had been drinking. *Id*. at 8. Defendant further submits that the officers did not investigate any of the caller's allegations prior to stopping him. *Id*.

Defendant further submits that he was seized before officers saw the gun in his waistband, as he was walking up the stairs, because one of the police reports says he was detained. *Id*. at 5. Additionally, Defendant submits that he was "unarmed and in handcuffs for more than six minutes before police learned his identity and developed probable cause to arrest him." *Id*. at 9. These circumstances, Defendant submits, constitute an unlawful arrest. *Id*. Finally, Defendant asks the Court to preclude the United States from referencing any post-arrest statements in its case-in-chief, as he was not given his *Miranda* rights, and did not waive those rights. *Id*. at 9-10.

In response, the United States submits that reasonable suspicion existed to detain Defendant. Docket No. 29 at 2-11. Specifically, the United States submits that the 911 caller, who identified himself with his name, phone number, address, apartment number, and current

location[4] and was thus not anonymous, indicated that a man possessed a gun illegally, it was tucked into his pants, and he had threatened to kill someone with it. *Id*. at 6, 10. Further, the United States submits that the caller told 911 that the man was hanging out with a group and had "smoked some weed and drank some beer." *Id*. The United States submits that the caller told 911 that the man with the gun was standing up, and had shown him the gun. *Id*. at 7. The United States additionally submits that the caller's statement that he was drinking a beer did not undermine his credibility, as he was able to "describe the suspect's physical attributes, what he was wearing, what kind of car he drove, and the precise location of the incident." *Id*. at 10.

The United States submits that, when police arrived at the location they had been given, they observed a group of people, including Defendant, who was wearing the clothes the caller had described, was standing up, and was holding a beer. *Id*. at 7, 8. The United States further submits that, when Officer Amundson shone his flashlight on Defendant, he "almost immediately turned and tried to walk away" and that, when Officer Amundson called after him asking to talk to him, Defendant "continued to walk away up the stairs in an effort to get away from the officers." *Id*. at 7. The United States contends that Defendant's "refusal to submit to lawful detention provided probable cause to arrest [him] for obstruction of a police officer" under Nevada law. *Id*. at 7 n. 8. The United States submits that the officers' detention of Defendant was a lawful *Terry* stop, based on the totality of the circumstances and that, during that detention, the officers observed a firearm on Defendant's person when he raised his hands above his head. *Id*. at 7. The United States further submits that the firearm would have been found as inevitable discovery during a *Terry* frisk even

---

[4]   After filing its response, the United States became aware of a second 911 call made by the same caller, in which he provided his name and phone number to dispatch. Docket No. 30 at 1; Exhibit 1.

if Defendant had not raised his arms over his head showing the gun or, alternatively, would have been found during a search incident to arrest for obstruction of a police officer. *Id*. at 7 n. 9. The United States submits that the caller's statement that Defendant was illegally possessing a firearm gave officers reason to suspect he was a prohibited person. *Id*. at 8.  Further, the United States submits that the caller's statement that the Defendant threatened to "fix someone" and to "take somebody out" gave officers reason to suspect Defendant would engage in a crime of violence. *Id*.  The United States additionally submits that the caller's statement that Defendant was under the influence of alcohol and marijuana and that Defendant was holding a beer when the officers first observed him gave officers reason to suspect that Defendant was in possession of a firearm while under the influence of alcohol, a controlled substance, or both, which is a crime under Nevada law. *Id*.  Finally, the United States submits that the officers noticed the firearm had a obliterated serial number as soon as they recovered it from Defendant, and that possession of a firearm with an obliterated serial number is a crime under Nevada law. *Id*. at 11 n. 13.

      Under the totality of the circumstances, the United States submits, objectively reasonable suspicion existed to believe that Defendant had committed, was committing, or was about to commit a crime. *Id*. at 9. The United States further submits that handcuffing Defendant does not turn a lawful *Terry* stop into a *de facto* arrest and, in any event, officers did not handcuff Defendant until after he had exhibited uncooperative behavior and after they observed the gun on his person. *Id*. at 11. Finally, the United States submits that the six minutes it took officers to conduct their investigation and learn that Defendant was a prohibited person was brief. *Id*.

      Regarding Defendant's post-arrest statements, the United States submits that it does not intend to use them in its case-in-chief. *Id*. at 12. The United States reserves the right, however, to use any statements as impeachment and/or rebuttal evidence. *Id*.

In reply, Defendant submits that the 911 call did not provide reasonable suspicion to justify an investigatory stop because the caller did not report any criminal activity. Docket No. 33 at 4. Even if the caller did report criminal activity, Defendant submits, the call lacked sufficient indicia of reliability because the caller was "partially anonymous [and did not give his name and phone number until after Defendant was in custody] and audibly intoxicated and he made broad, conclusory allegations of illegality." *Id*. at 4, 6. Further, Defendant submits that the officers' observations when they arrived on the scene "undermined any allegations of illegality," and that they arrested him without probable cause. *Id*. at 4-5.

In support of his argument, Defendant submits that police did not have specific, articulable facts to form a basis for suspecting that he was engaged in criminal conduct. *Id*. at 7. Defendant contends that the 911 caller did not report any criminal activity because, although he stated that Defendant said he was going to "fix" someone, he also said that Defendant was currently not threatening, arguing, or fighting with anyone and was just "having fun." *Id*. Further, Defendant submits, the officers' observations when they arrived on the scene did not add to reasonable suspicion that criminal activity was afoot. *Id*. at 7-8. Defendant additionally submits that officers had no reason to believe that Defendant was in violation of Nevada law prohibiting the possession of a gun with a blood alcohol content (BAC) of .10 or more, under the influence of a controlled substance, or under the influence of both alcohol and a controlled substance. *Id*. at 9.

"The Fourth Amendment permits brief investigative stops ... when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (internal quotation marks omitted). An investigatory detention, a brief seizure by police based on reasonable suspicion of criminal activity, is a "narrowly drawn exception to the probable cause requirement of the Fourth

Amendment." *Terry v. Ohio*, 392 U.S. 1, 26 (1968). *See also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (Fourth Amendment permits investigatory stops when law enforcement officers have "reasonable suspicion" that criminal activity "may be afoot") (internal quotation marks omitted). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc).

The police may stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons. *Terry*, 392 U.S. at 22-24. "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id*. at 21 (citations and internal quotation marks omitted). "In assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Ultimately, the analysis remains one of reasonableness, and thus the court must examine the "totality of the circumstances" surrounding the stop to determine whether the length is reasonable. *See United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008). Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) (internal citation omitted).

Determining reasonable suspicion requires considering the totality of the circumstances, and "all relevant factors must be considered in the reasonable suspicion calculus-even those factors

10

that, in a different context, might be entirely innocuous." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). The Ninth Circuit defines reasonable suspicion as "'specific, articulable facts' which together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (quoting *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)). Reasonable suspicion may depend on an officer's personal experience and special training to make inferences and deductions, as long as the conclusions are reasonable. *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (internal citation omitted). *See also Lopez-Soto*, 205 F.3d at 1105 (*quoting United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)) (police officer "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation'").

When considering the totality of the circumstances, courts must keep in mind that reasonable suspicion is a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983). Reasonable suspicion may not be based on "broad profiles," "overbroad generalizations," or "a prefabricated or recycled profile of suspicious behavior[.]" *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121, 1124, 1126 (9th Cir. 2002) (internal quotation marks omitted). However, a stop may be founded on reasonable suspicion despite a possible innocent explanation for every police observation. *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). Moreover, given that the standard for reasonable suspicion is "a particularized and

objective basis for suspecting the person stopped of criminal activity[,]" the "quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *Id*. (internal quotation marks omitted).

Because courts "consider both the inherent danger of the situation and the intrusiveness of the police action ... pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not *automatically* convert an investigatory stop into an arrest that requires probable cause." *Lambert*, 98 F.3d at 1186 (emphasis in original). The Ninth Circuit has "permitted the use of intrusive means to effect a stop where the police have information that the suspect is currently armed or the stop closely follows a violent crime. Under such circumstances, holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest." *Edwards*, 761 F.3d at 982.

The court must, therefore, determine whether Defendant's investigatory detention was based on reasonable suspicion. Whether a person has been seized for purposes of the Fourth Amendment is a mixed question of law and fact. *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994). The Ninth Circuit defines "reasonable suspicion" as "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Rojas-Millan*, 234 F.3d 464, 468-69 (9th Cir. 2000) (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)). If an officer does not have reasonable suspicion, and the stop therefore violates the Fourth Amendment, any evidence obtained as a result of the stop must be suppressed as fruit of the poisonous tree. *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

Here, the parties disagree as to whether the tip, given by the 911 caller, was reliable. Defendant submits that the call was anonymous, while the United States submits that the caller gave his name, location, and two separate phone numbers.[5]  Looking at the circumstances in the light most favorable to Defendant, the Court analyzes the call as an anonymous tip.

Under appropriate circumstances, an anonymous tip can demonstrate "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *Navarette v. California*, 134 S.Ct. 1683, 1688 (2014).  The Ninth Circuit has summarized the salient factors of *Navarette*, and has emphasized four points:

> (1) The caller claimed eyewitness knowledge of the alleged dangerous activity, lending 'significant support to the tip's reliability,' … (2) the caller made a statement about an event 'soon after perceiving that event,' which is 'especially trustworthy,' … (3) the caller used 911, which 'has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity,' … and (4) the caller created reasonable suspicion of an ongoing and dangerous crime … rather than 'an isolated episode of past recklessness.'

*Edwards*, 761 F.3d at 984.

The Court finds that, even if the call is considered an anonymous tip, it meets the *Edwards* requirements for reliability.[6]  The caller gave a description of Defendant and stated that he saw Defendant with the gun in his waistband and in his hand, that he heard Defendant state he was

---

[5] Defendant also submits that the caller was unreliable because he was drunk and made jokes about things like needing money for his son's school tuition. The Court, having listened to the entire 911 call, does not find that the caller was drunk, although he did state at the end that he was drinking a beer. The caller was able to describe the scene and the events with specificity, and was able to answer with specificity all questions asked of him. Further, the Court did not note a slurring of the caller's words. Finally, the Court does not find that the caller's comment about needing money for his son's tuition or the comment about one of the people on the scene perhaps engaging in prostitution detracts from his reliability.

[6] If the call is not considered an anonymous tip, it clearly has strong indicia of reliability.

13

going to "fix" somebody, that he was "going to kills somebody," and that he was "going to take somebody out," and that he saw Defendant drinking and smoking marijuana. The caller, therefore, clearly claimed eyewitness knowledge of the alleged dangerous activity. Second, the caller made his statement right after seeing the events he described; in fact, Defendant was still in the same place the caller said he was when the police arrived – therefore, the caller made his statement soon after perceiving the event. Third, the caller used 911 to report his observations about Defendant. Fourth, the caller created reasonable suspicion of an ongoing and dangerous crime, and not an isolated episode of past recklessness. Whether the caller gave his name and phone number before or after Defendant was stopped, then, is unimportant to this analysis. Under the applicable caselaw, even if the caller was anonymous until after Defendant was stopped, his tip was reliable.

While the caselaw seems to indicate that, as the caller's tip demonstrated sufficient indicia of reliability to provide reasonable suspicion for the investigatory stop, the officers could have stopped Defendant based solely on the caller's statements, they did not do so. The Court, therefore, need not make a determination as to whether the tip alone provided enough reasonable suspicion for the investigatory stop. When the officers arrived on the scene, they found it as the caller had described. They also found Defendant, who matched the description given by the caller, with a beer in his hand. As the officers shone a flashlight on the scene, Defendant turned and started walking up the stairs, away from the officers.[7] The officers then asked Defendant to stop because they wanted to talk to him, but he kept walking. As an officer went up the stairs after Defendant,

---

[7] In watching the bodycam video, the Court finds that Defendant's statement that he raised his hands to shield his eyes from the light of the flashlight and then walked away from the light in his eyes is inaccurate. Indeed, the video does not show Defendant shielding his eyes. The video shows Defendant raising his hands over his head, dropping them, and turning to walk away from the officers up the stairs.

Defendant raised his hands, and the officer could see a gun in his waistband.  Under the totality of the circumstances, the Court finds that the information given in the 911 call – the description of Defendant, his vehicle, and the location, the statement that Defendant illegally possessed a gun, brandished the gun twice, made threats that he would "fix" someone and he would "take someone out," that he was "threatening to kill somebody," and that he smoked marijuana and drank beer - combined with the scene that matched that information, Defendant's attempt at flight,[8] Defendant's failure to follow police instructions, and the sight of the gun in Defendant's waistband clearly provided reasonable suspicion for the investigatory stop.[9]

Once the police conducted the investigatory stop and recovered the weapon, they learned that it had an obliterated serial number, which is clearly a crime.[10]  The officers could have arrested Defendant at that time.  Whether or not Defendant was officially under arrest at that time, the Court finds that six minutes is a reasonable period of time in which to learn Defendant's prior record.  At that point, officers knew that Defendant was a felon in possession of a firearm.

---

[8] While flight alone is not enough to establish reasonable suspicion, it can contribute to the determination that reasonable suspicion exists to believe that criminal activity is afoot.  *See United States v. Smith*, 217 F.3d 746, 750 (9th Cir. 2000).

[9] Defendant submits that, under *Florida v. J.L.*, 529 U.S. 266 (2000), no reasonable suspicion existed for the stop.  In *J.L.*, an anonymous caller reported to police that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  *Id*. at 268.  Police stopped J.L. based solely on the tip and, as the Court stated, "[a]part from the tip, the officers had no reason" to suspect him of illegal conduct.  *Id*.  Further, no audio recording of the tip existed, and "nothing is known about the informant."  *Id*.

In the instant case, however, an audio recording of the 911 call exists, and information is known about the caller, including his name, phone number, and apartment number.  Further, officers did not stop Defendant based solely on the tip in the 911 call; rather, Defendant's actions themselves added to the totality of the circumstances that created reasonable suspicion.

[10] The Court need not reach the United States' alternate arguments regarding other crimes Defendant could have been arrested for, inevitable discovery, or search incident to arrest.

15

### III.   RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's motion to suppress evidence, Docket No. 27, be **DENIED**.

IT IS FURTHER RECOMMENDED that Defendant's motion to suppress his post-arrest statements, Docket No. 27, be **DENIED** as moot, as the United States has represented that it will not use those statements in its case-in-chief.

DATED: May 25, 2018.

_____
NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

### NOTICE

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).